# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

GENE CODES CORPORATION,

        Plaintiff,

v.                                 Case No. 09-14687

NAOMI THOMSON,

        Defendant.

_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pending before the court are Defendant's and Plaintiff's cross-motions for summary judgment, filed on June 4, 2010, and June 22, 2010, respectively. According to the court's June 14, 2010, order setting a briefing schedule: Plaintiff's motion brief, filed on June 22, 2010, was combined with a response to Defendant's motion; Defendant filed a response to Plaintiff's cross-motion combined with a reply to Plaintiff's response on July 6, 2010; and Plaintiff filed a reply to Defendant's response on July 12, 2010. The parties appeared for oral argument on July 22, 2010.[1] For the reasons stated below, the court will grant in part and deny in part Defendant's motion and deny Plaintiff's motion.

## I. BACKGROUND

Plaintiff specializes in developing software that analyzes DNA sequences and converts them into readable computer data. (Def.'s Mot. Summ. J. at 1; Pl.'s Mot.

---

[1] The court acknowledges with regret the unusually lengthy time taken to finalize this opinion, and appreciates the parties' patience.

Summ. J. at 2.)  Plaintiff's primary DNA-sequence analysis software, "Sequencer,"

analyzes segments of DNA sequenced using the "Sanger" method.[2]  (Def.'s Mot.

Summ. J. at 3; Pl.'s Mot. Summ. J. at 1.)  Plaintiff's products are used to identify gene

sequences by genomics researchers.  (Pl.'s Mot. Summ. J. at 1.)

Defendant Naomi Thomson worked for Plaintiff from 1999 until November 2009.

(Def.'s Mot. Summ. J. at 1; Pl.'s Mot. Summ. J. at 9.)  Defendant was initially hired as a

"Product Manager," and she performed a variety of roles related to product

development, sales, and technical support.  (Def.'s Mot. Summ. J. at 1; Pl.'s Mot.

Summ. J. at 9.)  In December 2008, Plaintiff, citing a restructuring plan and Defendant's

lackluster performance, changed Defendant's position to "Global Manager," reducing

her responsibilities and cutting her compensation in half.  (Def.'s Mot. Summ. J. at 1;

Pl.'s Mot. Summ. J. at 10.)  After December 2008, Defendant worked primarily in

technical support with continued, though limited, access to Plaintiff's customer

database.  (Def.'s Dep. 41, Feb. 5, 2010.)

In December 2009, Defendant accepted a position with CLC bio, a move she had

been discussing with CLC bio for several years.  CLC bio also produces DNA

sequencing software.  (Def.'s Mot. Summ. J. at 3.)  Until 2007, CLC bio, like Plaintiff,

focused on developing software compatible with Sanger sequencing data.  (Def.'s Mot.

Summ. J. at 3; Pl.'s Mot. Summ. J. at 3.)  In 2008, CLC bio began marketing "Genomics

Workbench," a DNA sequencing software that analyzes "Next-Generation" sequencing

---

[2]  The Sanger method is named for Frederick Sanger, the Nobel prize winning
chemist who invented the chain termination method of sequencing using
dideoxyribonucleic acids.

data.  (Def.'s Mot. Summ. J. at 3; Pl.'s Mot. Summ. J. at 3.)  Unlike Sanger software, which typically only handles small to medium sets of data, Next-Generation software is capable of analyzing very large sets of data.  (Def.'s Mot. Summ. J. at 3; Pl.'s Mot. Summ. J. at 3.)  Though CLC bio continues to sell a product, "DNA Workbench," that analyzes Sanger sequencing data, Genomics Workbench is now their primary focus. (Def.'s Mot. Summ. J. at 5.)  Defendant's new job revolves around marketing and selling Genomics Workbench.  (*Id.* at 6.)  While selling Genomics Workbench, Defendant has contacted twenty-four clients who have purchased Gene Codes' Sequencher in the past.  (Pl.'s Mot. Summ. J. Ex. 38.)

Plaintiff alleges that Defendant has violated Michigan's Uniform Trade Secrets Act ("MUTSA") and also contends that Defendant is in breach of the parties' 1999 employment agreement.  The breach of contract claim is based on two theories.  First, Plaintiff claims that Defendant is violating the employment agreement's non-compete clause, which provides, in pertinent part:

> Because the technologies developed at GENE CODES are likely to be of great value and interest to direct competitors, that is, organizations that sell similar products and/or services to the same customers as GENE CODES and to the exclusion of GENE CODES products or services, your employment by such direct competitors in any capacity can reasonably be predicted to be damaging to the interests of GENE CODES.  Therefore, you agree that, for a period of 24 months following the termination of your employment, you will not accept employment in any capacity with a direct competitor of GENE CODES.

(Pl.'s V. Compl. Ex. 2 § 5(c).)  Second, Plaintiff asserts that Defendant is in breach of the employment agreement's non-solicitation clause, which provides that:

> During your employment with GENE CODES and for a period of two years thereafter, you agree to not solicit any GENE CODES clients or customers (including prospective clients and customers) to terminate their business

3

> relationship with GENE CODES, or to solicit GENE CODES clients or
> customers for business services or product purchases of the type provided
> by GENE CODES or reasonably related to the business of GENE
> CODES.

(Pl.'s V. Compl. Ex. 2 § 3(e).)  The parties have filed cross-motions for summary

judgment on all three of Plaintiff's claims.

## II.  STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is proper when

there is no genuine dispute as to any material fact and the moving party is entitled to

judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "Where the moving party has

carried its burden of showing that the pleadings, depositions, answers to interrogatories,

admissions and affidavits in the record, construed favorably to the non-moving party, do

not raise a genuine issue of material fact for trial, entry of summary judgment is

appropriate."  *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex v.

Catrett*, 477 U.S. 317 (1986)).  In considering a motion for summary judgment, the court

must view the facts and draw all reasonable inferences from the admissible evidence

presented in a manner most favorable to the nonmoving party.  *Dunigan v. Noble*, 390

F.3d 486, 492 (6th Cir. 2004) ("[W]e must determine 'not whether there is literally no

evidence, but whether there is any upon which a jury could properly proceed to find a

verdict for the party producing it upon whom the *onus* of proof is imposed.'").  Where the

"evidence presents a sufficient disagreement to require submission to a jury," summary

judgment is inappropriate.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52

(1986).

Once the moving party has properly supported its motion for summary judgment, the non-moving party must put forth enough evidence to show that there exists a "genuine issue for trial." *Horton v. Potter*, 369 F.3d 906, 909 (6th Cir. 2004). The existence of some factual dispute, however, does not defeat a properly supported motion for summary judgment; the disputed factual issue must be material. *Anderson*, 477 U.S. at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict—'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'"). A fact is "material" for purposes of summary judgment when proof of that fact would have the effect of establishing or refuting an essential element of the claim or a defense advanced by either party. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).

### III.  DISCUSSION

The parties' dispute encompasses two questions: First, has Defendant misappropriated any trade secrets? Second, is Defendant is liable for breach of contract?

### A.  Violation of MUTSA

In her motion for summary judgment, Defendant raises two primary issues with respect to Plaintiff's claim of misappropriation. First, Defendant argues that Plaintiff has not identified any actual trade secrets protected by MUTSA. Defendant contends that Plaintiff's customer lists are not trade secrets because "the identity of Gene Codes' customers are publicly available on its website and elsewhere on the internet." (Def.'s Resp. Summ. J. at 16.) Defendant further asserts that Plaintiff's alleged plans to

incorporate Next-Generation software into future products is not a trade secret because the company had "no specific plan or strategy" that would rise to the level of a protectable trade secret.  (*Id.* at 19.)  Even if Plaintiff had specific plans regarding Next-Generation software, Defendant maintains that she was unaware of them.  (*Id.*)

Plaintiff counters by arguing that its customer lists are not publicly available: of its 10,000 customers, only 27 representative samples are identified on its website.  (Pl.'s Reply Summ. J. Ex. 46 ¶ 4.)  Plaintiff argues that the identities of customers interested in Next-Generation software is particularly in need of protection in light of the fact that Defendant is now working for a company that sells Next-Generation software.  (Pl.'s Mot. Summ. J. at 26.)

Second, Defendant argues that, even if Plaintiff has identified protectable trade secrets, Plaintiff cannot support a claim of misappropriation because there is no evidence that Defendant took or disclosed any of Gene Codes' alleged proprietary information.  (Def.'s Resp. Summ. J. at 16.)  Plaintiff concedes that Defendant has not actually disclosed any trade secrets and bases its MUTSA claim on a theory of inevitable disclosure.  Aside from arguing that Michigan law does not recognize inevitable disclosure, Defendant also contends that Plaintiff cannot support its inevitable disclosure theory because there is no evidence of duplicitous behavior indicating that Defendant is likely to misappropriate trade secrets.  (Def.'s Resp. Summ. J. at 20 & n.13.)

In response to this argument, Plaintiff argues that the record contains unrebutted evidence of Defendant's duplicity such that the court should grant Plaintiff's motion for summary judgment on the trade secrets claim.  Plaintiff argues that Defendant engaged

in duplicitous behavior when she, while still working at Gene Codes, solicited CLC bio for employment, emailed CLC bio "competitive information" about changes in the Vector NTI market, and informed CLC bio of Illumina's enthusiasm for CLC bio's products. (Pl.'s Mot. Summ. J. at 25.)  Plaintiff argues that Defendant contacted twenty-four Gene Codes' customers and that this evidences her duplicity.  (*Id.* at 25.)

### 1. Existence of Trade Secrets

MUTSA prohibits "[d]isclosure or use of a trade secret of another without express or implied consent" by a person who knowingly acquired such information "under circumstances giving rise to a duty to maintain its secrecy or limit its use."  Mich. Comp. Laws § 445.1902(b).  A trade secret merits protection if (1) it derives independent economic value from not being generally known, and (2) the employer takes reasonable steps to protect the confidentiality of the information.  Mich. Comp. Laws. § 445.1902(d).

Plaintiff has not produced evidence such that a reasonable jury could identify specific trade secrets deserving of MUTSA's protection.  While a customer list may constitute a trade secret entitled to protection from misappropriation, *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Ran*, 67 F. Supp. 2d 764, 775 (E.D. Mich. 1999), Plaintiff has failed to identify any particular customer list that Defendant could potentially misappropriate.  Plaintiff contends that memory alone is sufficient to support a violation of MUTSA.  While this may be true, aside from vague assertions of a customer list, Plaintiff has not identified what list it is that Defendant is alleged to have memorized or reconstructed.  Moreover, Plaintiff has presented no evidence that any of Defendant's customers at CLC bio were customers with whom she had contact at Gene Codes.

And, even assuming that Plaintiff has a customer list that could be identified as a trade secret, there has been no evidence presented that Plaintiff took reasonable steps to maintain its confidentiality. In light of the actual evidence presented, Plaintiff's allegation that it has a customer-list trade secret reduces to a claim that it had customers and Defendant knew who some of these customers were. This is not enough to allow a reasonable jury to find that Plaintiff has a protectable customer-list trade secret.

Nor does the court view Plaintiff's vague plans to potentially incorporate Next-Generation software into its products as a protectable trade secret. Plaintiff admits that CLC bio is simply the "first-to-market with the 'latest and greatest' technology in the marketplace." (Pl.'s Reply Summ. J. at 1.) Moreover, Plaintiff admits that it has publicly announced that Gene Codes is in development of a Next-Generation product. (Pl.'s Mot. Summ. J. Ex. 6 at 98.) Plaintiff's plan is no longer secret. Accordingly, because Plaintiff's trade secrets claim is based solely on threatened disclosure—rather than past, actual disclosure—the announced plan to enter the "NextGen" market cannot form the basis for the trade secrets claim here.

### 2. Inevitable Disclosure

Even if Plaintiff were able to survive summary judgment on the existence of a trade secret, it would still have to produce enough evidence to allow a jury to find misappropriation. It has not. A court can enjoin "actual *or threatened* misappropriation of a trade secret." Mich. Comp. Laws § 445.1903(1) (emphasis added); *Merrill Lynch*, 67 F. Supp. 2d at 775. Because Plaintiff admittedly has no evidence showing or suggesting that Defendant has used or disclosed any trade secrets, Plaintiff relies upon

the doctrine of inevitable disclosure. While Michigan has not specifically endorsed this doctrine, it has been mentioned in federal and state cases arising in Michigan. *Degussa Admixtures, Inc. v. Burnett*, 471 F. Supp. 2d 848, 856 (W.D. Mich. 2007). For example:

> Even assuming that the concept of "threatened misappropriation" of trade secrets encompasses a concept of inevitable disclosure, that concept must not compromise the right of employees to change jobs. Accordingly, we hold that for a party to make a claim of threatened misappropriation, whether under a theory of inevitable disclosure or otherwise, the party *must establish more than the existence of generalized trade secrets and a competitor's employment of the party's former employee who has knowledge of trade secrets.*

*CMI Int'l, Inc. v. Intermet Int'l Corp.*, 649 N.W.2d 808, 813 (Mich. Ct. App. 2002) (emphasis added) (citations omitted); *see also United Rentals (N. Am.), Inc. v. Keizer*, 355 F.3d 399, 412 (6th Cir. 2004); *Kelly Servs., Inc. v. Marzullo*, 591 F. Supp. 2d 924, 942 (E.D. Mich. 2008); *Degussa*, 471 F. Supp. 2d at 856. To establish threatened misappropriation, a party must specifically identify the trade secret likely to be misappropriated and must convince the court of the former employee's "duplicity" by proffering evidence indicating a significant lack of candor or willingness to misuse trade secrets. *Marzullo*, 591 F. Supp. 2d at 942; *CMI Int'l*, 649 N.W.2d at 813.

The court agrees with Defendant that Plaintiff has no basis with which to support a claim of misappropriation, threatened or otherwise, because no reasonable jury could find that Defendant's alleged actions amount to evidence of duplicity enough to warrant a finding that Defendant has violated MUTSA. Plaintiff asserts that duplicity is supported by Defendant's contact, since being employed with CLC bio, with several customers that were Plaintiff's customers; solicitation of and employment with CLC bio; and two comments to CLC bio at a trade show while she was still working for Plaintiff.

Defendant's contact with some of Plaintiff's customers, assuming that it occurred, indicates no more than that the companies have overlapping customers, a point generally acknowledged at oral argument. It does not so clearly indicate a willingness to misappropriate trade secrets as to evince duplicity, particularly since Defendant admits only to recognizing names and because there is no evidence that Defendant actually sought out Plaintiff's customers. Defendant contacting customers of both CLC bio and Plaintiff, even if in violation of a non-compete agreement, does not support a finding of duplicity. *See MSC.Software, Inc. v. Altair Eng'g, Inc.*, No. 07-12807, 2009 WL 1856222, at *4 (E.D. Mich. June 25, 2009) (defendant's knowledge of trade secrets and employment in a similar position for a competitor was insufficient evidence to allege a threatened misappropriation claim); *Marzullo*, 591 F. Supp. 2d at 939, 943 (defendant's work for a competitor performing the same services and serving the same market area, an unmistakable violation of his non-compete agreement, was not sufficient evidence of threatened misappropriation); *Degussa*, 471 F. Supp. 2d at 857 (defendant's use of relationships with former customers in a manner that would have violated a non-existent non-compete agreement did not support reliance on inevitable disclosure doctrine).

Discussing employment with CLC bio in 2006 is not evidence of duplicity. This is true even in light of Defendant's admission that she declined the offer out of fear that such employment would breach her employment agreement with Plaintiff. *See Marzullo*, 591 F. Supp. 2d at 943 (defendant's statements that he thought his actions would breach his non-compete agreement is insufficient to support a claim of threatened misappropriation). Nor do Defendant's emails to CLC bio about the well-

known changes in the licensing of Vector NTI and about Illumina's enthusiasm for CLC bio's evince a willingness to disclose Plaintiff's confidential information. The changes in Vector NTI licensing was publicly known, so it was not as if Defendant was revealing sensitive information. And, in light of the fact that Illumina is a Next-Generation instrument manufacturer, (Pl.'s Mot. Summ. J. at 7), and CLC bio had already released its Next-Generation products when Defendant sent the email, the court does not see how this email evinces anything more than Defendant's enthusiasm towards potential employment with CLC bio. Rather than being indicative of duplicity, these communications are simply examples of small talk and camaraderie amongst competitors.

No reasonable jury could conclude, based on this record, that Defendant has misappropriated, or will inevitably misappropriate, Plaintiff's alleged trade secrets. Defendant's motion for summary judgment with respect to Plaintiff's claim of misappropriation of trade secrets will be granted.

## B. Breach of Contract

The parties' motions for summary judgment present several issues with respect to Plaintiff's breach of contract claim. First, the parties dispute the admissibility of certain evidence relating to the competitive positions of Gene Codes and CLC bio. Second, the parties dispute whether Defendant has breached the non-compete clause of the employment agreement in accepting employment with CLC bio. Third, the parties dispute whether Defendant's actions at CLC bio have breached the non-solicitation clause of the employment agreement.

### 1. Evidentiary Dispute

Both parties assert evidentiary issues.  Defendant contends that the testimony of

Dr. Winston Hide on the issue of whether Gene Codes and CLC are direct competitors

is inadmissible.  She argues that Federal Rule of Civil Procedure 37(c) bars the

testimony because Dr. Hide's expert report did not include any opinion on the

competitiveness of the companies.  (Def.'s Resp. Summ. J. at 3.)  For its part, Plaintiff

argues that Exhibits N, O, P, Q, and R to Defendant's motion should be stricken

because the affidavits of lay witnesses impermissibly contain expert opinion.  (Pl.'s

Reply Summ. J. at 11.)  At this time, the court need not consider the merits of either of

these arguments because there is sufficient evidence, without consideration of the

disputed evidence, establishing material issues concerning the facts upon which the

disputed testimony and exhibits bear.

## 2.  Non-Compete Clause

Plaintiff's non-compete claim raises these three questions: (1) whether the non-

compete clause is enforceable; (2) whether any alleged breach by Defendant would be

excused by the undisputed fact that Plaintiff cut Defendant's salary by fifty percent and

reduced her job duties; and (3) whether Defendant's employment with CLC bio actually

constitutes a breach of the non-compete clause.

First, section 4(a)(1) of the Michigan Antitrust Reform Act ("MARA") authorizes

an employer to require a non-compete agreement to protect its "reasonable competitive

business interests," but it also requires that such an agreement be "reasonable as to its

duration, geographical area, and the type of employment or line of business."  Mich.

Comp. Laws § 445.774a.  At oral argument, both parties conceded that the non-

compete clause is reasonable and enforceable under the act.  The court agrees with this proposition and will not address the issue further.

Second, Defendant argues that cutting her salary in half and reducing her job duties amounted to an initial breach of the employment agreement, barring Plaintiff from enforcing the non-compete agreement.  Defendant, relying upon an implied covenant of good faith and fair dealing, contends that the employment agreement contained an implied term that Defendant would not materially reduce her compensation.  Defendant also argues that, at the very least, Plaintiff has unclean hands and therefore cannot seek equitable relief.

"The rule in Michigan is that one who first breaches a contract cannot maintain an action against the other contracting party for his subsequent breach or failure to perform."  *Michaels v. Amway Corp.*, 522 N.W.2d 703, 706 (Mich. Ct. App. 1994) (quoting *Flamm v. Scherer*, 198 N.W.2d 702, 706 (Mich. Ct. App. 1972)).  "The covenant of good faith and fair dealing is an implied promise contained in every contract 'that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'"  *Hammond v. United of Oakland, Inc.*, 483 N.W.2d 652, 655 (Mich. Ct. App. 1992) (quoting *Fortune v. Nat'l Cash Register Co.*, 364 N.E.2d 1251, 1257 (Mass. 1977)).  However, Michigan courts have been "unwilling to recognize a cause of action for breach of an implied covenant of good faith and fair dealing in cases involving at-will employment relationships."  *Id.* (citing *Cockels v. Int'l Bus. Expositions, Inc.*, 406 N.W.2d 465, 468 (Mich. Ct. App. 1987)); *see also Schipani v. Ford Motor Co.*, 302 N.W.2d 307 (Mich. Ct. App. 1981).  Michigan does not recognize claims of wrongful demotion based on employee

13

expectations where an employee has, as here, freely and voluntarily entered into an at-will employment contract, without procuring an express promise that her salary will remain steady. *See Baragar v. State Farm Ins. Co.*, 860 F. Supp. 1257, 1262 (W.D. Mich. 1994) (demotion and salary reduction); *Fischhaber v. Gen. Motors Corp.*, 436 N.W.2d 386, 389 (Mich. Ct. App. 1989) (job assignments). Defendant has not provided any evidence of an agreement that her salary and job duties would stay the same throughout her employment; rather, she merely suggests that "halving a professional's salary . . . is an unusual step for an employer to take." (Def.'s Mot. Summ. J. at 26 n.11.) Defendant cannot, as a matter of law, invoke the covenant of good faith and fair dealing in order to escape her contractual obligations.

Defendant has also failed to present any evidence from which a reasonable factfinder could find that the "clean hands" doctrine bars Plaintiff from enforcing the non-compete clause. While Defendant need not prove that Plaintiff's conduct is of such nature as to be punishable as a crime or as to justify legal proceedings of any character, Defendant must present some evidence that Plaintiff has acted with bad faith relative to the relief sought. *Stachnik v. Winkel*, 230 N.W.2d 529, 534 (Mich. 1975). Defendant has failed to point to any evidence of bad faith on Plaintiff's part.[3] Plaintiff, on the other hand, has provided evidence that its decision to reduce Defendant's salary was part of a restructuring plan, during which it reduced the salaries of fifteen other employees. (Bair Aff. ¶ 4.) Plaintiff has also provided evidence that prior to her salary reduction,

---

[3] Defendant refers somewhat cryptically in her deposition testimony to an "uncomfortable incident" with Howard Cash, but does not mention this in her argument that Defendant has unclean hands. (Def.'s Dep. 200, Feb. 5, 2010.)

Defendant failed to complete her duties as product manager.  (*Id.* ¶ 5.)  Defendant has no actual evidentiary basis on which to form her claim that Plaintiff has "unclean hands."

Third, both parties argue that they are entitled to summary judgment on the issue of whether Defendant's employment with CLC bio is in breach of the non-compete clause.  Defendant argues that she has not breached the non-compete clause because CLC bio is not a "direct competitor" of Plaintiff within the meaning of the non-compete clause.  She contends that because CLC bio has incorporated Next-Generation software into its products since 2008, its DNA Sequencing products have different capabilities than and are "complementary" to Plaintiff's products.  (Def.'s Resp. Mot. Summ. J. at 5.)

Plaintiff counters by arguing that CLC bio and Gene Codes are "direct competitors" within the meaning of the non-compete clause because both of their products perform the same basic functions and CLC bio is merely the first to market with the "latest and greatest" technology in the marketplace.  (Pl.'s Reply Mot. Summ. J. at 1.)  Plaintiff also argues that CLC bio marketed a Sanger product, like Sequencer, until June 2008, when it released its Next-Generation product.  Plaintiff argues that both CLC bio and Gene Codes produce software capable of analyzing the same data.  According to Plaintiff, it plans to develop a Next-Generation product, and maintains that "[i]t would seem an absurd result if CLC bio stopped being a competitor of Gene Codes [in] June 2008 and only became competitive again when Gene Codes releases 'Sequencer 5.0.'"  (Pl.'s Mot. Summ. J. at 21.)

The employment agreement defines a "direct competitor" as an "organization[] that sell[s] similar products and/or services to the same customers as GENE CODES and to the exclusion of GENE CODES products or services."  It is undisputed that Plaintiff's Sequencer product has capabilities different from those of CLC bio's Genomics Workbench.  There is, however, a disputed issue as to how this fact fits into the term "direct competitor."  "The fact that two parties to a contract may differ on the interpretation of terms in that contract does not, by itself, render summary judgment inappropriate." *Cleveland-Cliffs Iron Co. v. Chicago & N. W. Transp. Co*, 581 F. Supp. 1144, 1149 (W.D. Mich. 1984).  In such a case, "[t]he real issue is not whether the parties disagree on the meaning of terms to the contract, but whether the terms themselves are ambiguous." *Id.*  The primary goal in interpreting contracts under Michigan law "is to determine and enforce the parties' intent."  *Old Kent Bank v. Sobczak*, 620 N.W.2d 663, 666-67 (Mich. Ct. App. 2000).  When the contractual language is clear and unambiguous, its meaning is a question of law for the court to decide. *Conagra, Inc. v. Farmers State Bank*, 602 N.W.2d 390 (Mich. Ct. App. 1999). However, "the trier of fact must determine the meaning of an ambiguous contract."  *T & S Distrib., L.L.C. v. Mich. Bell Tel. Co.*, No. 274767, 2008 WL 724084, at *4 (Mich. Ct. App. Mar. 18, 2008); *see also Karibian v. Village Green Mgmt. Co.*, No. 287165, 2010 WL 1138028, at *3 (Mich. Ct. App. Mar. 25, 2010).

The court finds that a material fact issue exists as to whether CLC bio is a "direct competitor" within the meaning of the non-compete clause.  A reasonable factfinder could certainly find, from the evidence presented, that CLC bio sells products "to the exclusion of" Gene Codes products.  There is evidence suggesting that Sanger

16

sequencing software is capable of handling the same sets of data, but at a slower rate than Next-Generation software, (Thomson Aff. ¶ 10), and Defendant admits that Sanger software is considered to be the "first generation" of data sequencing software. (Def.'s Mot. Summ. J. at 3 n.1.) There is also evidence that CLC bio focused on producing Sanger software until 2007, when it began developing Next-Generation software, and that Gene Codes has plans to follow in its footsteps. (Cash Dep. 59, Feb. 16, 2010.) There is evidence that CLC bio continues to sell a product incorporating Sanger data—DNA Workbench. And, finally, Plaintiff has produced evidence of over 100 surveys from prospective customers who were considering, at least at some level, Plaintiff's products instead of CLC bio's. (Pl.'s Reply Summ. J. Ex. 42.).

However, a reasonable factfinder could also find, from the evidence presented, that Sequencher and Genomics Workbench are "complementary" products, as Defendant contends. Defendant has produced evidence that a customer may need Sequencher, Genomics Workbench, *or both*, and argues colorably that having one does not satisfy the need for the other. (Thomson Aff. ¶ 15; Hide Dep. 108, May 14, 2010.) There is also evidence that Genomics Workbench is preferable for labs seeking to analyze large sets of data quickly, whereas Sequencher is preferable for labs that analyze smaller projects in greater detail. (Metzker Dep. 82-83, May 13, 2010.) Gene Codes's own president could not identify any business that he has lost to CLC bio. (Cash Dep. 82, Feb. 16, 2010.) A reasonable factfinder could find, from this evidence, that Genomics Workbench is not sold "to the exclusion of" Sequencher.

The court cannot readily determine on summary judgment the meaning of the term "direct competitor" as bound up in the facts of this case. While the phrase "similar

17

products" implies that the term "direct competitor" encompasses all companies selling products with the same function, the phrase "same customers as Gene Codes and to the exclusion of Gene Codes products" strongly indicates that "direct competitor" was intended to be limited to only those software companies selling the same caliber of software. Accordingly, it is for the trier of fact to determine whether CLC bio and Gene Codes are "direct competitors" within the meaning of the non-compete clause. Both parties' cross-motions with respect to that issue will be denied.

### 3. Non-Solicitation Clause

Plaintiff contends that Defendant has violated the contract's non-solicitation agreement, but Defendant maintains that, since she is not working for a "direct competitor," she has not breached the clause. She contends that, in light of the contract as a whole, the court should read the non-solicitation clause as prohibiting her from soliciting Plaintiff's customers to purchase a product from a "direct competitor" within the meaning of the non-compete clause. (*Id.* at 15.) Defendant argues that reading the non-solicitation clause to restrict her job at CLC bio would result in an unreasonable and thus unenforceable non-compete clause. Plaintiff responds that the non-solicitation clause prohibits soliciting Gene Codes clients for product purchases "reasonably related to the business of Gene Codes," and selling Genomics Workbench to customers who have purchased software from Gene Codes is therefore in violation of the clause. (Pl.'s V. Compl. Ex. 2 § 3(e); Pl.'s Reply Mot. Summ. J. at 6.)

The court agrees with Plaintiff that the unambiguous scope of the non-solicitation clause necessarily encompasses Defendant's work at CLC bio. The term "reasonably related" is considerably more broad than the agreement's definition of "direct

18

competitor," and if the parties had intended the non-solicitation clause to only apply to Defendant's work for a direct competitor, they could have used that term instead. Even if a trier of fact found that Genomics Workbench and Sequencher were "complementary products," as Defendant asserts, there is no evidence to support a conclusion that the two products cannot be found "reasonably related." The fact remains that, despite their differences, CLC bio and Gene Codes produce DNA sequencing software.

Moreover, no reasonable factfinder could find that restricting Defendant's sales work at CLC bio would render the non-solicitation clause unenforceable. Like non-compete clauses, non-solicitation clauses are enforceable to the extent that they are reasonable. *See Kelly Servs. v. Eidnes*, 530 F. Supp. 2d 940 (E.D. Mich. 2008) (applying MARA standards to clause prohibiting solicitation of former employer's customers); *see also Hilliard v. Clark*, No. 1:07-cv-811, 2007 WL 2589956 (W.D. Mich. Aug. 31, 2007). Even if Genomics Workbench is a complementary product, Defendant's solicitation of previous clients on behalf of CLC bio could give CLC bio an unfair advantage in competition with Plaintiff. Defendant could use her contacts from her work with Gene Codes to convince former clients that Genomics Workbench is better suited for their research needs. And even if Defendant is unsuccessful at selling former clients Genomics Workbench, those clients may be persuaded to purchase CLC bio's Sanger software instead. Plaintiff has a legitimate business interest, beyond mere competition, in preventing Defendant from using the goodwill she developed at Plaintiff's expense to solicit Plaintiff's customers on behalf of CLC bio. Defendant has not presented any evidence from which a trier of fact could conclude differently.

However, preventing Defendant from soliciting any of Plaintiff's customers, irrespective of whether she had contact with them while working for Plaintiff, is not reasonably related to Plaintiff's legitimate business interests. The court finds that the non-solicitation clause in section 3(e) of the employment agreement is enforceable only as to customers that Defendant herself successfully solicited on behalf of Plaintiff or with whom Defendant had built up goodwill while working for Plaintiff. *See Frontier Corp v. Telco Commc'ns Group, Inc.*, 965 F. Supp. 1200, 1208 (S.D. Ind. 1997) (applying Michigan law). Because the record is undeveloped with respect to Defendant's previous contact with the Gene Codes customers she solicited, the court is unable to determine, at this stage in the litigation, whether Defendant's communications with Gene Codes customers must constitute a breach of the non-solicitation clause as modified. (*See* Pl.'s Mot. Summ. J. Ex. 38.)

Moreover, the court finds Defendant's assertion in oral argument that the term "customer" is ambiguous to be an important issue of fact. It is unclear whether Defendant's work with entire institutions, such as a University, would render the entire institution within the scope of the non-solicitation clause, or whether the clause only restricts her work with individual departments—or even individual scientists—with whom she developed rapport while at Gene Codes.

Because the two issues regarding the interpretation of the term "customer" in the non-solicitation clause may not have been anticipated by the parties, the court is inclined to allow some limited additional discovery bearing on those issues if it is desired. The court will initiate a telephone conference with counsel to discuss the necessity of any additional discovery. Notice will follow separately from this order.

20

## IV.  CONCLUSION

IT IS ORDERED that Defendant's motion for summary judgment [Dkt. # 27] is

GRANTED IN PART and DENIED IN PART.  It is GRANTED with respect to Plaintiff's

MUTSA claim and is DENIED as to all other aspects.

IT IS FURTHER ORDERED that Plaintiff's motion for summary judgment [Dkt. #

30] is DENIED.


                             s/Robert H. Cleland
                             ROBERT H. CLELAND
                             UNITED STATES DISTRICT JUDGE

Dated:  February 11, 2011

I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, February 11, 2011, by electronic and/or ordinary mail.


                             s/Lisa Wagner
                             Case Manager and Deputy Clerk
                             (313) 234-5522